## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| BENJAMIN DAVID TEMPLE, and<br>WATCH OVERKILL, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. _____ |
| | ) | |
| PEJMAN GHADIMI, and<br>SECRETCONSULTING, LLC d/b/a<br>WATCH TRADING ACADEMY, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW Plaintiffs Benjamin David Temple and Watch Overkill, LLC, and for their

Complaint against Defendants Pejman Ghadimipour a/k/a Pejman Ghadimi (hereafter, "Ghadimi")

and Secret Consulting, LLC d/b/a/ Watch Trading Academy ("WTA"), state and allege as follows:

### NATURE OF THE ACTION

1.      This action is brought by Plaintiff Benjamin David Temple and his company,

Plaintiff Watch Overkill, LLC, regarding the Watch Trading Academy ("WTA") that is run by

Defendant Pejman "PJ" Ghadimi and his company, Defendant Secret Consulting, LLC, and its

shady business practices. In inducing potential "students" to sign up for the WTA, Defendants rely

on provable misinformation, deceptive acts and practices, and intimidation.

2.      When Plaintiff Temple investigated Ghadimi, Ghadimi's partner Luis Miranda, and

the WTA, and began to report his findings, Ghadimi authored a defamatory Facebook post which

he shared with the 3,000+ member Watch Trading Academy Insider Members Facebook group.

Within minutes of that post, it was shared across other watch selling groups within the industry.

After Ghadimi's post, Plaintiffs were essentially put out of business.

1

3.     Plaintiffs bring this action for defamation, fraud, tortious interference, and violations of the Kansas Consumer Protection Act ("KCPA"), seeking compensatory damages, statutory damages, punitive damages, attorneys' fees and costs, pre- and post-judgment interest, and any other relief the Court may deem appropriate.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over this case under 28 U.S.C. § 1332, since Plaintiffs are residents of Kansas and Defendants are residents of Florida. The amount in controversy exceeds $75,000.

5.     Venue is proper in this District because Defendants are subject to personal jurisdiction here. Specifically, Defendants targeted clients, including Plaintiffs, in this district, Defendants' false and misleading statements about Plaintiffs have caused injury in this District, and Defendants knew Plaintiffs were located in Kansas and thus knew that their false and misleading statements would cause damage to Plaintiffs in this District.

## PARTIES

6.     Plaintiff Benjamin David Temple is a citizen of Kansas.

7.     Plaintiff Watch Overkill, LLC is a limited liability corporation organized under the laws of Kansas. Temple formed Watch Overkill, LLC for the purpose of buying and selling watches.

8.     Defendant Pejman Ghadimi is a resident of the state of Florida. He can be served at 1201 Georgia Street, Unit B, Delray Beach, FL 33444.

9.     Defendant Secret Consulting Florida, LLC d/b/a Watch Training Academy ("WTA") is a Florida limited liability corporation organized under the laws of Florida. It can be

served at 1201 Georgia Street, Unit B, Delray Beach, FL 33444.

10.     At all times relevant to this action, Pejman Ghadimi was acting on behalf of, for the benefit of, and in concert with WTA, which authorized, approved of, and ratified his conduct.

## FACTUAL BACKGROUND

11.     Around 2017, Plaintiff Temple began looking for a supplemental income and signed up to take a course that taught how to buy and sell luxury watches. This course was run by Ghadimi and WTA.

12.     In inducing customers to take his class, including Plaintiff, Ghadimi made numerous provable misrepresentations and falsehoods, inflating his own self-worth, as well as the potential profits that could be made from his program.

13.     Ghadimi claims a self-worth of approximately $40 million and makes claims of owning tens of millions of dollars' worth of cars and watches.

14.     Ghadimi claimed that he made profits from buying and selling watches of approximately $1,000,000. In 2020 alone, Ghadimi claimed $912,114.00 in profit. Upon information and belief, these numbers have been significantly inflated by Ghadimi.

15.     Ghadimi also claimed that his "prize student," Luis Miranda, had similarly made profits of more than $1,000,000.00. In fact, Miranda's purported success was a major selling point for the class.

16.     Ghadimi stated that he had personally audited Miranda's books for verification.

17.     Ghadimi's website states that "[o]ver the last 20 years, Pejman has built a multitude of businesses ranging from a one-of-a-kind investment firm that focuses on an alternative asset management known as 1 OFF Investments to a series of online education businesses including Secret Entourage, Exotic Car Hacks and Watch Trading Academy. These platforms have forced

people to rethink their understanding of business, luxury assets and money management. Since their birth, Pejman's companies have grossed well over **$420,000,000.00 in combined revenue.**" (emphasis in original). Upon information and belief, that number was significantly inflated by Ghadimi.

18.     Plaintiff Temple enrolled in the Watch Trading Academy and paid for several courses as he worked his way up to what Defendants referred to as the "final destination." Enrollment in the final course cost approximately $5,000.00. As to the price of the course, Ghadimi stated, "I had told Luis that I wasn't sure if I was comfortable charging that much for a course, regardless that it was 16 hours of content and filled with very specific Rolex based strategies. **He assured me that once students learn this content they would make more than that in just two flips and in some cases even in just 1 flip.**" (emphasis in original).

19.     Ghadimi promised that the enrollment in the course would be limited to 10 people. This purported exclusivity was one of the main draws of the WTA program, as Ghadimi explained that a saturated market would diminish the effectiveness of his sales techniques.

20.     However, as Plaintiff Temple began reaching out to other members of the WTA program, he discovered that enrollment was not limited to 10 people, and that the class size was significantly larger than it was advertised to be.

21.     Temple discovered that in fact 43 people were enrolled in the WTA program.

22.     After some time with the program, Plaintiff Temple began turning a modest profit, although nowhere near the profit that Defendants promised.

23.     However, after working with Miranda, Temple discovered that Miranda's claims of making more than one million dollars from selling watches was false. Essentially, Miranda was participating in a Ponzi scheme.

24.     Temple and his partner Ezequiel "Niko" Rubio bought eight watches from Miranda for $104,000.00. However, Temple and Rubio only received one of the watches, and when Temple asked about the other seven watches, Miranda claimed the money was "gone." Upon information and belief, Defendants and Miranda kept this money.

25.     Miranda received many of his watches that he "flipped" from Laspis Lazuli LLC, d/b/a Alku Modern Jewelers ("ALKU"), which was owned by Santiago Ramirez Mora and Juan Carlos Javadi and managed by Mora.

26.     Miranda paid Mora approximately $8.8 million for 855 watches, and approximately 354 watches were not delivered by Mora. Upon information and belief, Mora has since been indicted for wire fraud and identity theft.

27.     When Temple and Rubio began looking into Miranda, they discovered that Miranda had not made even close to $1,000,000, even though Defendants vouched for Miranda and indicated that they had audited his books several times.

28.     Rubio is a CPA and former fraud auditor at Ernst and Young. He received a copy of Miranda's books and instantly was able to identify that they were mostly fabricated and almost certainly had never been audited by anyone. Miranda was recognizing revenue when he was paid, rather than when goods were delivered to the customer, and Rubio was able to recognize this fraudulent practice within a short time auditing Miranda's books.

29.     When Plaintiff Temple confronted Defendants about Miranda's fraudulent behavior, Ghadimi assured Temple that Temple would be repaid half of the $5,000 course fee, with the other half to be repaid within six months, but that Temple needed to be more careful about who he did business with. Ghadimi made this statement despite the fact that he promoted Miranda

as his star pupil and as a trustworthy partner in the watch industry.

30.     Despite Ghadimi's assurances, Temple was never repaid the second $2,500.00 for the course.

31.     Temple began investigating Ghadimi more closely and discovered that Ghadimi lied about his success and inflated his and Miranda's net worth in order to sell more classes.

32.     Ghadimi actively worked to conceal his misrepresentations in order to keep the course profitable.

33.     After Mora's indictment, on or about September 13, 2020, Temple informed several members of the industry about his investigation into Miranda and Ghadimi, which included Miranda's indictment.

34.     Before Plaintiff Temple could go public with his investigation and findings, also on September 13, 2020, Ghadimi made a post to the Watch Trading Academy Insider Members. The post stated as follows:

> The Untold Story of the $4M loss from our Student Luis Miranda, and why there is an active federal investigation and multiple state investigations into many of our past members.
>
> VERY IMPORTANT POST, PLEASE READ CAREFULLY.
>
> If you are a veteran of WTA, you probably heard about Luis, the guy who made over $1M in profits trading watches. He came from audio to watches and after just 3 years doing it, started killing it by capitalizing on the rolex AD market. After breaking 250K in profits (we actually verified this with bank statements that matched claims), we asked Luis to create a course. This was what once the Rolex Course [sic].
>
> It was packed with great information on how to successfully get Ads to get you the rarest and best rolexes. Many of our members used the course to build great relationships and make a lot of money attaining hard to get models. Some of our members however were busy and decided to pay Luis himself money to find them watches (I myself paid him ahead to source me watches)
>
> The deal was if you had the money to send him and wait a set amount of time, he would guarantee certain models at MSRP. This is what you call a cash float. Its common in the

watch business but not very popular because markets change all the time. While people decided to do business with Luis instead of following the instructions and building their own relationships with Ads 7espite [sic] we always telling all of them to do the work as you cannot always buy fish from a fisherman. Many did so and did well, and others decided to do business direct with him instead of applying the info. In both cases members made great money until….

About a year about when Luis Walked into my office after a long flight from TX to tell me that he had taken $4M in orders from clients of his, and the person that sourced watches for him had stolen the money. I asked him why he was telling me and it was because he knew that about 20% of that were members of our group, mainly 7 of them.

I asked him if he had told our members and he said NO.

So here is how everything changed after that day.

4.   We immediately seized [sic] selling Luis' course, while the info was good, the teacher couldn't be trusted.

2. We forced Luis to contact all people involved and come clean about the loss they didn't know they had incurred.

3. We encouraged all members to file suit against the company they had paid and hand't received watches from.

4. I personally reached out to all impacted to ensure he had done so.

I have always warned you guys to ensure you do your research. I myself had given Luis about $30,000 like many other members for watches. He had been delivering for over 7 months without any issues to myself and many members who had all made money but before I placed a larger order, I asked questions to understand the process and then I discovered a flaw. He was under capitalized and was also over dependent, two things that scared me from placing a second order. Many who placed multiple orders probably never even checked this as they were making money already.

Fast forward 6 months later, a FBI investigation is filled [sic] in the matter based on the amount of the loss.

**Meanwhile, many of those impacted were hurt, disappointed and of course had lost money, one of which was our own Benjamin Temple (you know that broke kid that pretended to be making moves, but was really just a guy who didn't have $10 to his name and borrowed money to trade watches) Ben temple decided to become an opportunist because he had lost a ton of money because he had borrowed and committed to others that he could do what Luis was doing, when in reality he was just collecting money and giving it to Luis to buy for him. While he found out that Luis had lost the money, he wen out of his way to pretend that he didn't know yet and**

**instead starting collecting more money from new members who trusted him pretending he would deliver only to make sure he would recover his own money. In other words he defrauded our members. We found out after he reached out for a refund because he was blocked from the groups and we received a phone call from another member who asked "what happened to him, explaining the timeline of her losses," and therefore banned him from all the groups with no further refunds.**

Where does it all stand?

**Since the investigation into this matter, I have co operated [sic] multiple times into the two pending investigations that are currently open into the matter. The first being the larger case described above, and the second being the individual ones brought from members against other members like Ben Temple.** On both counts, we have co operated [sic] with the Feds to help them make sense of this and what is actually happening. I cannot share further details as I have been ordered in writing to not discuss the logistics until the cases are closed.

**If you are choosing to engage in a conversation about this matter outside of the authorities that are involved, I urge you to be careful in doing so, as many of those older members who have been kicked out or banned for fraud are under investigation now including Ben.** If you have been the victim of any of those people I mentioned above, regardless that it was intentional on their part or not, I have advised you to already file suit with the correct law offices so you may make your case and loss heard in case there is recovered money in the case.

In our community, being associated means to expose others to risk. So I would urge any of you who have any connection or are in direct communication with any of the said party to thread [sic] carefully as you are not only muddling in an open investigation but are also associating with individuals being openly investigated for FRAUD.

We take things like this seriously and since the birth of WTA have always warned all members (read the rules) on doing business with other members, and have even gone as far as getting involved in fixing issues that honestly we had no part in but in good faith resolved. Some things we can help and some we cannot.

If you have questions, please reach out directly to myself with any concerns or questions.

PJ

**PS: If you wonder why Ben Temple is pissed today going around sounding like he is the victim of something in his little $2 Chat groups, its because he messaged me asking for a refund when he already received a 50% refund (we cant control what we paid Luis (50%) to create the course itself) because he is dead broke and was told to go fuck himself because he defrauded members (and the idiot doesn't know he is ALSO under investigation) well he knows now.**

(emphases added).

35.     The entire post was provably false and defamatory. Most notably, Plaintiff Temple never defrauded any members of the industry, he never collected money from members for watches he knew would not be delivered, he is not under investigation for anything, and he is not "dead broke."

36.     This post received approximately 100 comments, many of which thanked Ghadimi for his honesty and indicated they would no longer work with Temple.

37.     Within minutes of the post, one of Temple's partners texted him that he no longer would do business with him.

38.     Plaintiffs' reputation was severely and irreparably damaged by Ghadimi's Facebook post.

39.     Upon information and belief, Ghadimi made this post in an attempt to discredit Plaintiffs prior to Plaintiffs going more public with their investigation and findings into Ghadimi and Miranda.

40.     Contrary to Ghadimi's assertion that Plaintiffs were committing fraud and collecting money for watches he knew would never be delivered, Plaintiff used Faizan Syed Ahmed, both a CPA and an attorney, to validate every transaction and prepare Plaintiffs' accounting and taxes.

41.     Plaintiffs did approximately $500,000 in sales in 2019, and Plaintiff Temple began to sell watches as a full-time job. After Ghadimi's post, Plaintiffs sales substantially decreased to approximately $5,000.

42.     Plaintiffs were unable to source from many of their former suppliers, who did not want to work with Plaintiffs because of the content of Ghadimi's post.

43.     Plaintiff Temple was refunded for half of the $5,000 course, but Ghadimi claimed the other half was being held by Miranda. Ghadimi told Temple that, if Miranda did not refund Temple within six months, Ghadimi would provide the refund.  Temple was never refunded that second half, and in fact, Ghadimi said "fuck u" to Temple when he asked about the refund, and Ghadimi kept all the money.

## CLAIMS

### COUNT I- FRAUD

44.     Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

45.     Defendants made numerous false statements concerning existing and material facts, including that:

    a.  Ghadimi has a self-worth of approximately $40 million, when in fact his self-worth is significantly less.

    b.  Ghadimi made almost $1,000,000.00 a year in profit selling watches.

    c.  Ghadimi's prize student, Luis Miranda, made profits of more than $1,000,000.00 a year selling watches.

    d.  Ghadimi's companies have grossed well over $420,000,000.00 in combined revenue.

    e.  Ghadimi personally audited Miranda's books for verification.

    f.  Enrollment in the Watch Trading Academy would be limited to 10 people and exclusivity was one of the main benefits of the program.

46.     Ghadami made these statements to induce students, like Plaintiffs, to enroll in his Watch Trading Academy classes and spend money on enrollment fees.

47.     Ghadimi made these statements on the behalf of, and for the benefit of, Watch Trading Academy, which authorized all the statements made by Ghadimi. At all times, Ghadimi was acting as an agent for Watch Trading Academy.

48.     Ghadimi worked to conceal the truth of his fraudulent statements in order to get students to enroll in the Watch Trading Academy and in order to keep them enrolled in the Watch Trading Academy.

49.     These statements were specifically made to Plaintiffs in 2017, which induced them to enroll in the Watch Trading Academy.

50.     These statements continue to be made today to induce other people to enroll in the Watch Trading Academy, and these statements led Plaintiffs to remain in the Watch Trading Academy until approximately September 2020, as Defendants' concealment prevented Plaintiffs from learning the falsity of Defendants' statements.

51.     Defendants made these statements on their website and over text message and Facebook messages to prospective students, including Plaintiffs.

52.     Defendants knew these statements were false at the time they were made, or recklessly made these states without any concern as to their validity.

53.     Plaintiffs relied on Defendants' fraudulent statements in paying $5,000.00 and enrolling, and remaining, in the Watch Trading Academy.

54.     Plaintiffs relied on Defendants' fraudulent statements in investing their own money into their product, pursuant to Defendants' promise that enrollment in the course was exclusive and beneficial.

55.     Plaintiffs sustained damages resulting from Defendants' fraudulent statement, including but not limited to $5,000.00 spent on the enrollment fee, $104,000.00 in watches that

Plaintiffs never received, the time and money spent on pursuing a career in watch sales full time, and the time and money spent investigating and disproving Defendants' claims.

56.     In making these fraudulent statements, Defendants acted willfully and wantonly and in a manner warranting punitive damages to punish their conduct and to deter similar future conduct by Defendants and/or others.

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants in such an amount as is fair and reasonable, along with punitive damages in an amount to punish Defendants and deter others from like conduct, pre- and post-judgment interest, an award of reasonable attorneys' fees, costs and expenses, injunctive relief as permitted by law and equity, and any other relief the Court deems just and proper.

## COUNT II- DEFAMATION

57.     Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

58.     On September 13, 2020, Ghadimi made a defamatory Facebook post to the Watch Trading Academy Insider Members.

59.     The post included numerous provable falsehoods, including that Plaintiffs defrauded members of the industry, that Plaintiffs collected money from members for watches he knew would not be delivered, that Plaintiffs were under investigation for fraud, and Plaintiffs were dead broke.

60.     Ghadami was acting as an agent for the Watch Trading Academy when he wrote this defamatory comment, and the Watch Trading Academy authorized, approved of, benefitted from, and ratified his post. Indeed, the post was made to the Watch Trading Academy Insider Members. Many of the members of the Facebook group thanked Ghadimi for his "honesty."

61.     While also acting as an agent for the Watch Trading Academy, Ghadami benefitted individually from his defamatory statements.

62.     These defamatory statements were communicated to numerous third parties, including every member of the Watch Trading Academy Group, which consisted of hundreds of members of the watch trading industry. 100 of these members actually commented on the Facebook post.

63.     Plaintiffs' reputation was severely and irreparably damaged by Ghadimi's Facebook post.

64.     Immediately after the post was made, one of Plaintiffs' partners texted him that he no longer would do business with him.

65.     Plaintiffs' sales went from $500,000 in 2019 to approximately $5,000, due to Defendants' scurrilous attack on Plaintiffs' reputation, which means everything in the watch trading industry.

66.     Plaintiffs have been unable to source from many of their former suppliers, who will not work with Plaintiffs because of the content of Defendants' post.

67.     Upon information and belief, Defendants have made other defamatory comments about Plaintiffs, but due to Plaintiffs' removal from the industry and alienation from its members, Plaintiffs do not know for sure the content of these comments.

68.     Defendants' acts were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle Plaintiffs to punitive damages in an amount sufficient to deter Defendants and others from like conduct in the future.

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants in such an amount as is fair and reasonable, along with punitive damages in an amount to punish

Defendants and deter others from like conduct, pre- and post-judgment interest, an award of reasonable attorneys' fees, costs and expenses, injunctive relief as permitted by law and equity, and any other relief the Court deems just and proper.

### COUNT III- TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONSHIPS OR EXPECTANCIES

69.     Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

70.     Plaintiffs had business relationships and expectancies with a number of traders, sellers, buyers, suppliers, and collectors.

71.     Plaintiffs had long-lasting relationships with these traders, sellers, buyers, suppliers, and collectors, and these relationships were expected to continue. These relationships and expectancies came with the probability of future economic benefit to the Plaintiffs.

72.     In fact, Plaintiffs made approximately $500,000 in 2019 due to these relationships and expectancies.

73.     Defendants were aware of and had knowledge of these business expectancies. Many of these expectancies were facilitated by Defendants through their Watch Trading Academy Program.

74.     Ghadami was acting as an agent for the Watch Trading Academy when he interfered with these relationships and expectancies, and the Watch Trading Academy authorized, approved of, and benefitted from, and ratified his interference.

75.     While also acting as an agent for the Watch Trading Academy, Ghadami benefitted individually from his defamatory statements.

76.     Except for Defendants' conduct, Plaintiffs' relationships with these traders, sellers, buyers, suppliers, and collectors were reasonably certain to have continued and these expectancies

were reasonably certain to be realized.

77.     Defendants' misconduct was intentional and for the purpose of interfering with Plaintiffs' expectancies and damaging his ability to make a living in the watch trading industry.

78.     Defendants were not justified in intentionally interfering with Plaintiffs' business relationships and expectancies.

79.     Plaintiffs were severely damaged by Defendants' actions. Plaintiffs' sales went from $500,000 in 2019 to approximately $5,000, due to Defendants' interference in Plaintiffs' business relationships and expectancies.

80.     Defendants' acts were willful and intentional and/or in reckless disregard of the rights of Plaintiffs and entitle Plaintiffs to punitive damages in an amount sufficient to deter Defendants and others from like conduct in the future.

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants in such an amount as is fair and reasonable, along with punitive damages in an amount to punish Defendants and deter others from like conduct, pre- and post-judgment interest, an award of reasonable attorneys' fees, costs and expenses, injunctive relief as permitted by law and equity, and any other relief the Court deems just and proper.

## COUNT IV- VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT

81.     Plaintiffs restate and re-allege the above paragraphs as if fully set forth in this cause of action.

82.     The Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 *et seq.* prohibits the use of deceptive and/or unconscionable acts and practices in connection with consumer transactions in Kansas.

83.     Plaintiff David Benjamin Temple is a "consumer" as defined by K.S.A. § 50-

624(b).

84.     Defendants are "suppliers" as that term is defined by K.S.A. § 50-624(l).

85.     Plaintiff Temple's purchase of and enrollment in the Watch Trading Academy class constitutes a "consumer transaction" as defined by K.S.A. § 50-624(c).

86.     Plaintiff has been damaged and is "aggrieved" pursuant to the KCPA as a result of Defendants' conduct.

87.     The KCPA is to be liberally construed to promote its policies of protecting consumers from suppliers that commit deceptive acts and unconscionable acts and practices. *See* K.S.A. § 50-623; *Williamson v. Amrani*, 283 Kan. 227, 234, 152 P.3d 60, 67 (2007).

88.     Defendants' violations of K.S.A. § 50-626, Deceptive Acts and Practices, include but are not limited to, the following:

    a.  Defendants made false and/or misleading representations of fact, knowingly or with reason to know, in violation of K.S.A. § 50-626(a);

    b.  Defendants willfully failed to state a material fact and/or willfully concealed, suppressed, and/or omitted a material fact, in violation of K.S.A. § 50-626(b)(3).

    c.  Defendants committed deceptive acts and/or practices in violation of K.S.A. § 50-626 included, but not limited to, the following:

        i.  Falsely representing that the Watch Trading Academy had sponsorships, approval, accessories, characteristics, and benefits that it did not have;

        ii. Falsely representing that the Watch Trading Academy was of a particular standard, quality, grade, style, or model, when the reality of the standard, quality, grade, style or model of the Watch Trading Academy differed materially from the representation.

iii. Falsely representing that Plaintiffs would receive a full refund of the money spent on the Watch Trading Academy.

iv. Falsely representing that enrollment in the Watch Trading Academy was limited to 10 people, when in fact, enrollment was not limited at all.

v. False representing that Defendants and Luis Miranda made millions of dollars from trading watches and that prospective students could expect to make similar money.

vi. Falsely representing that Defendants and Luis Miranda followed the methods taught in the Watch Trading Academy in making profits from watch trading.

vii. Falsely representing that Defendants' net worth was approximately $40 million dollars.

viii. Falsely representing that Defendants audited the books of their star student who claimed to make millions of dollars from trading watches.

ix. Engaging in a pattern of conduct that, when taken in its totality, was deceptive.

89.    Defendants' violations of the KCPA were continuing, and Defendants utilized the same deceptive methods in connection with all consumer transactions between them and prospective students as they used between them and Plaintiff Temple.

90.    Defendants concealed their violations of the KCPA by withholding that their acts and practices were deceptive, relying on numerous misrepresentations to do so. It was only in 2020, after Plaintiff Temple began investigating Defendants, that it discovered Defendants' concealment and misrepresentations.

17

91.     Plaintiff Temple is entitled to a declaratory judgment that these acts and practices violate the KCPA pursuant to K.S.A. § 50-634(a)(1).

92.     Plaintiff Temple is entitled to a restraining order against Defendants to prevent them from continuing to violate the KCPA pursuant to K.S.A. § 50-634(a)(2).

93.     Plaintiff Temple is entitled to recovery of his damages or a civil penalty as provided in K.S.A. § 50-636(a), whichever is greater.

94.     Plaintiff Temple is entitled to the recovery of his reasonable attorneys' fees and costs, pursuant to K.S.A. § 50-634(e).

WHEREFORE, Plaintiffs pray for a judgment in their favor and against Defendants in such an amount as is fair and reasonable, along with statutory damages pursuant to the KCPA, an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, a declaratory judgment that Defendants are engaging in unfair, unlawful, and/or deceptive practices, pre- and post-judgment interest, an award of reasonable attorneys' fees, costs, and expenses pursuant to K.S.A. § 50-634(e), and any other just and proper relief available under the KCPA. *See* K.S.A § 50-623 *et seq.*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable herein.

## DESIGNATED PLACE OF TRIAL

Plaintiff hereby designates Kansas City, Kansas as the place of trial in this matter.


Dated: September 13, 2021          Respectfully submitted,

|  | MCINNES LAW LLC<br>By: */s/ Jack D. McInnes*<br>Jack D. McInnes (KS #21898)<br>Benjamin D. Ashworth (KS #28083)<br>1900 West 75th Street, Suite 220<br>Prairie Village, Kansas 66208<br>Telephone: (913) 220-2488 |
| --- | --- |

|  | Facsimile: (913) 273-1671<br>jack@mcinnes-law.com<br>ben@mcinnes-law.com<br><br>ATTORNEYS FOR PLAINTIFF |
|--|--|